Case No. 22-2178 from Western Missouri, D. Bart Rocket, v. Hon. Eric Eyming Case No. 22-2138 from Eastern Missouri, G. St. Louis Construction Labor, v. D. Bart Rocket, v. Hon. Eric Eyming  V. F. W. Contracting, et al. Case No. 4 is Case No. 22-2021 from Eastern Missouri, L. Nise, v. City of St. Louis, Missouri, et al. Case No. 5, 22-2495 from Eastern Missouri, State of Missouri, X. R. L. v. The People's Republic of China, et al. And the last case of the day, Case No. 21-3356 from Eastern Arkansas, John Smith v. Jeremy Andrews, et al. First case for argument is United States v. Joshua Duggar. Good morning, everyone. We have a very full docket this morning. And for notice purposes, I'll just inform you the Court will take a brief recess after the third argument this morning. And then we'll return after 10 minutes or so for the concluding three arguments. Mr. Gelfand. Good morning, everyone. Good morning, and may it please the Court. This Court should reverse the conviction below for three reasons. First, the District Court applied a test the U.S. Supreme Court has already determined is unconstitutional in denying Mr. Duggar the opportunity to present a complete defense. Second, Mr. Duggar was interrogated outside the presence of his attorney after law enforcement had physically taken his phone from his hand when he was attempting to contact his counsel. And third, the District Court erroneously introduced expert testimony as lay testimony as to a critical issue in the case, EXIF metadata. And making matters even more egregious, the District Court denied the defense computer forensic expert, Michelle Bush, the opportunity to critique the methodology that the government's expert witness, Mr. Fotrell, utilized. The first issue, the opportunity to present a complete defense. At trial, the defense attempted to elicit testimony from a witness who was under subpoena and physically outside of the courtroom available to testify, Caleb Williams. Caleb Williams, for context, had worked at Wholesale Motor Cars, which was the scene of the alleged crime. Caleb Williams was listed on a sales contract as the salesperson approximately six weeks earlier. He regularly used the only computer at issue, the HP PC computer, for purposes that had nothing to do with Wholesale Motor Cars or Josh Duggar. He used it to print shipping labels for eBay sales personally. He texted Mr. Duggar on May 7th, approximately a week before the alleged crimes, offering to, quote, watch the lot the following week. He spent the night one mile away from the lot at a car lot, by the way, two days later on May 9th of 2019. He took a photo of Mr. Duggar in the office where the alleged crime occurred of Mr. Duggar using a MacBook laptop in the car lot office, not the HP computer at issue. And he concealed all metadata in the documents that he provided to the government when investigators finally, at the 11th hour just before trial, did any investigation as to him. My understanding is that the district court didn't preclude you or your client from calling Mr. Williams. It was just a threshold showing of a nexus between, I guess, a time and a place nexus. Is that correct? No, Your Honor. What the district court did is the district court expressly said that we could call Mr. Williams for a very limited purpose. We could ask him whether he had knowledge or recollection of being present on the lot between May 13th and May 16th and whether he remoted in. But what the district court next said is critical. And this is on page 1364 of Volume 6 of the transcript. He said, if he says he wasn't there and didn't remote in, in other words, if he denies committing the crime for which Mr. Duggar was on trial, quote, that's as far as you're going to get. And he further explained that he would not permit impeachment based on Mr. Williams' prior felony conviction for a crime against a child, a sex crime against a child. But isn't that exactly what Judge Kobus just asked you, that there was an insufficient nexus unless he admitted on the stand that he was actually there or had remoted in or had some connection to that computer? Your Honor, I don't believe so, and I'll tell you the reason why. The day before this sidebar at trial happened, there was a critical on-the-record, in-chambers conference on this exact issue that sheds light into the test that the district court actually applied. And it was not the insufficient nexus test that applies in the Tenth Circuit and that has never been adopted by this Court. But putting that legal issue aside. What's the test that should have been used under Eighth Circuit precedent? The test that should have been used is the test that applied in the Holmes case, which is that you have an absolute constitutional right to present evidence of an alternative perpetrator. That's what the U.S. Supreme Court said. That's binding precedent in this Court. But to answer the Court's question, Judge Strauss, what the Court said, and this is on pages 9, 10, and 9, 11 of Volume 5, this is that day before hearing, was critical. The Court said, this concept that the greater the strength of the evidence, in other words, the government's evidence and the Court's view on that, quote, that weighs into part of the Court's analysis as to whether it will include or permit or exclude that, end quote. And so what the Court was saying a day before trial is essentially that the Court was looking at this through the lens of if the Court believes the strength of the government's case is greater, then that decreases the relevance or the appropriateness of admitting this alternative perpetrator testimony. But that's an unconstitutional test. And then the very next day — Is the Court simply requiring an appropriate foundation, appropriate evidence for a foundation for testimony that you would have liked to have solicited? Precisely because the Court articulated the test that was invalidated in Holmes, invalidated in Holmes, as the test that the Court was applying. And that's the significant distinction here, and that's the distinction with a difference. This was not a foundation issue. And by the way, as we briefed, there was unambiguously a sufficient nexus if this Court were to hypothetically adopt the Tenth Circuit's rationale. But that goes only to some of the testimony, because my read of the record is, at least with respect to the prior conviction, the District Court was quite clear in doing a Rule 403 balancing. And I basically said that it would create confusion for the jury, sort of a mini-trial, et cetera. And so I don't — maybe you have a different view, but I don't think that goes to the prior conviction at all. Your Honor, I think it goes to the prior conviction insofar as the Court was considering at that sidebar, and at the Men's Conference — I'm sorry, at the Chambers Conference the day before, the issues combined. Because what the Court essentially said was, you can call Caleb Williams and you can ask him, under oath, did you commit the crime? And if he says no, you're done. No lawyer in their right mind is going to call a witness to say that and then have to sit down without the ability to impeach them. So what was the evidence that you wanted to get in? The evidence that linked Mr. Williams as an alternative perpetrator, specifically that he places himself regularly, and the evidence places him regularly at the car lot or near the car lot, using the computer that was the only computer, despite many electronic devices and computers being seized, that had alleged child pornography on it. That Mr. Williams specifically texted Mr. Duggar on May 7th, and we wanted to authenticate that text through Mr. Williams, offering to, quote, watch the lot, end quote, during the time period, or at least very close in time to the time period that this crime occurred. And at that point, the District Court effectively deprived Mr. Duggar of that ability. It was not our burden. It would be burden-shifting to prove that Mr. Williams committed any crime. So was the takeaway of the evidence that you wanted to get admitted, basically, that he had access to the computer? What we wanted to get admitted was that he had access to the computer, familiarity with the computer, access to the car lot, and that the government failed to prove Mr. Duggar guilty beyond a reasonable doubt by failing to rule out Mr. Williams as an alternative perpetrator. And it's a reasonable doubt analysis that's key. The burden always remains on the prosecution here and everywhere. That's not only what the law allows, but what the Constitution requires, and that's what the Supreme Court emphasized in the Holmes case. And that's what's so troubling about what's clear in the record here. There's no ambiguity about what the court did. There's no ambiguity in the text, both the day before and at sidebar, that the court was applying. And that's critical. There's, bear in mind, no response from the government in its briefing as to this conference the day before. And that's what sheds significant light by the court's own words as to how the court was approaching this precise issue. That requires reversal under Holmes. The second issue is that of suppression. And in this particular instance, federal agents made a beeline after doing surveillance waiting for Josh Duggar to appear at Wholesale Motorcars to execute a search warrant. They swarm in in six law enforcement vehicles. They're wearing ballistic vests and they're armed. And they make a beeline, two of them, directly towards Mr. Duggar. At that point, he takes out his phone, physically puts it to his ear, and there's no factual dispute in the record below and in the trial court below, both of the suppression hearing and the trial testimony, that Mr. Duggar lifted his phone to his ear for the precise purpose of contacting his legal counsel. What federal agents did is they physically took the phone out of his hand, and from that point forward, deprived him of the ability to communicate with his legal counsel, as was his constitutional right. Was there a phone on the premises? Any other phone on the premises? There's no evidence at all in the record of phones that were either not seized. There were other phones, Your Honor, that were seized by law enforcement, for example, from other people that were present at the car lot. Was there any statement by the officers that he could not make contact with them or that that was prohibited? There was no express statement, Your Honor, I don't believe. However, there was no physical mechanism for him to contact counsel. He was told he was free to go. Is that correct? The testimony at the trial below and at the suppression hearing was that he was told he was free to go. But that's not the test. No reasonable person sitting in his shoes at that time would believe that their freedom of movement was not. Did he seek to go to an adjacent business or someplace else to make a phone call? No, Your Honor. And the reason why, and this is undisputed in the record, is that as the court found as a factual finding, obviously subject to significant deference by this court, is that this lot was accessible only by a four-lane divided highway with no sidewalk. It was, quote, in the middle of nowhere, end quote. That's the district court's finding. And what's critical about that is there was nowhere to go. So the notion that, you know, if what is essentially being pictured is this, you know, car lot in like a, you know, a car mall, if you will, that's the exact opposite of what this was. This is a used car lot in the middle of nowhere that's literally accessible with a highway with no sidewalk. He had no phone. Did he explicitly invoke his right to counsel, though, and say, hey, I don't want to, you know, I want to call counsel, I don't want to answer any questions? Your Honor, I believe he did explicitly invoke his right to counsel. And it was undisputed that that's what the agent understood his attempt to do. I actually think it's, if there is a such thing, Your Honor, it's more than actually invoking the right to counsel when you physically try to contact counsel and when law enforcement literally prevents you from doing so by interfering with the mechanism that you're using to contact counsel. That's one step even greater than some of the court's prior jurisprudence of, you know, is it a clear invocation? You know, was it maybe I should talk to a lawyer, maybe I shouldn't? This was literally an attempt, I'm calling my lawyer, and the agent's saying, no, you're not, and physically taking the object from his hand. You don't contest the fact that the warrant authorized the officers to seize the phone? No, Your Honor. So your suggestion is here the Constitution would require them to wait until he finishes his phone call and then seize it? No, Your Honor, the Constitution does not require them to wait and to seize it, but the Constitution after the invocation of counsel requires them not to interrogate him until his lawyer is physically present. So the issue is not about the seizure of the phone. But there wasn't an, where in the record is there an actual invocation of the right to counsel? When the special agent who testified at the suppression hearing expressly admitted in no uncertain terms that Mr. Duggar was taking his phone out and articulated that he was calling his lawyer. I believe that's as clear an invocation of the right to counsel as you could possibly have. I am calling my lawyer. That's an invocation of the right to counsel. That's not vague. And it wasn't misunderstood by the agent either. The agent, to his credit, admitted that under oath at the suppression hearing. Do you have presidential authority for that act being a clear statement of invocation? No, Your Honor. And one of the things that's really interesting here is that of all of the cases involving the invocation of the right to counsel and the issues that are before this Court, this is the only case that I could find, there may be other cases out there, but it's the only case that I could find where an individual was physically in the act of contacting counsel and was physically stopped by law enforcement from doing so. That's a unique fact pattern. That's a unique situation. It's not surprising that that doesn't happen or hasn't happened historically, at least to the extent of further litigation. Did Mr. Duggar state to the police officers, I want my attorney before I will talk to you? In those words, no, Your Honor, but I believe by stating I'm calling my lawyer and physically doing it, that's a clear invocation of the right to counsel. I don't think there was any ambiguity into the agent's credit. No one has suggested at all at the trial court below, at suppression or at any point, that this was an ambiguous invocation of the right to counsel. But all of this in terms of the suppression depends on him being in custody under our Griffin factors. And what's the best, in your view, other than the fact that it's remote and other than the fact they came in with these ballistic vests, what's your best argument that he's in custody despite the fact they told him he wasn't in custody? Your Honor, under the, what the Griffin court says is non-exhaustive Griffin factors, but the factors that have been used, as the court pointed out, for approximately 30 years, plus or minus, the best arguments that he was in custody is this context under Miranda's version of custody. Would a reasonable person believe that he's free to leave? Did he have a vehicle to depart in? No, Your Honor. The vehicle that he came in was seized or was, it wasn't seized, it was searched. And so he had no access to it. And all the keys to the other vehicles at the car lot were in the office where law enforcement was physically at. And there's actually testimony that he wouldn't have been allowed to enter any of those buildings without an escort. That's on page 31 of the suppression hearing. And so what's significant here, Your Honor, is that these agents are wearing ballistic vests. They're armed. The circumstance is such that when he invokes, or at least what we believe is invokes, his right to counsel, they're coming at him, making a beeline towards him, and physically stopping him from contacting his attorney. That's what no reasonable person would sit there and say, police regularly grab my hand. That's kind of analogous to what someone would think if your hands are grabbed, that you are being placed under arrest. And in that instance, I think that under Griffin, which of course is a case-specific analysis here on de novo review, that what this court should find is that he was actually in custody. If I may reserve the remainder of my time for rebuttal. All right. Let's go for it. Handel? Good morning, Your Honors, and may it please the Court, Josh Handel for the United States. I'll begin with the alternative perpetrator evidence and the Caleb Williams issue. So there was no error in the district court's ruling on the hypothetical testimony of Caleb Williams. I think it's helpful to remember at the outset what the undisputed lay of the land is here. Everyone agreed at trial that the partitioned section of Mr. Duggar's computer, which was the part of the computer containing all of the child sexual abuse material, where all of the child sexual abuse material evidence was recovered, had to have been installed by someone who is physically present at Mr. Duggar's computer on May 13, 2019. There was no evidence that Mr. Williams was present on Mr. Duggar's car lot or even in the State of Arkansas on that date. To the contrary, the partitioned section, to refresh my recollection, was that generally available to anyone using the computer or was it protected in some way? No, Your Honor. It was password protected by the password Intel 1988 that Mr. Duggar had used for years across a number of accounts. Yes. And to the contrary, there was abundant evidence. All the available evidence indicated that Mr. Williams was not present in Arkansas on that date or any other date relevant to the conduct here. Mr. Williams told, I believe, both sides' investigators that he was not there on that date. He was outside Arkansas between May 11th and May 16th. And the government proffered that it had receipts, videos, and, if necessary, live testimony from multiple witnesses confirming that Mr. Williams was outside Arkansas for that entire period. Now, notwithstanding that uncontroverted evidence placing Mr. Williams elsewhere, the district court did give Mr. Duggar a wide berth to elicit relevant testimony. The court told Mr. Duggar that he could call Mr. Williams to the stand. Upon doing so, Mr. Duggar would have been allowed to ask Mr. Williams about any fact to which Mr. Williams was a percipient witness, including Mr. Williams' dates of employment at the car lot, his prior experience with the computer, his contacts and text messages with Mr. Duggar. I believe that Record Document 156, page 21, the district court goes through all of the different aspects that Mr. Duggar would have been permitted to ask Mr. Williams about if he had called him to the stand. He also would have been permitted to lay a factual foundation for Mr. Williams' personal knowledge of or involvement in the relevant conduct, including by asking whether Mr. Williams was present at the car lot between May 13th and 16th and whether he had ever remotely accessed Mr. Duggar's computer. The sole limitation that the district court imposed was that if Mr. Williams testified that he was not present between May 13th and 16th and that he had never remotely accessed Mr. Duggar's computer, the defense would not then be allowed to impugn Mr. Williams as an alternative perpetrator based solely on his unrelated prior sex offense. That limitation was consistent with at least four lines of authority. Number one, with federal rule of evidence 602, which limits admissible testimony to only those matters where, quote, evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Here, there was no evidentiary foundation for Mr. Williams' presence at the car lot or remote access to the computer on the relevant dates, except that which Mr. Williams might provide through his own testimony. The district court appropriately permitted Mr. Duggar to try to lay such a foundation through Mr. Williams' testimony, but it made clear that if Mr. Williams testified in such a way that did not lay a foundation for his presence or his access, then there would be no basis to continue with that line of questioning. The court's limitation was also consistent with its gatekeeping rule under federal rule of evidence 403, which permits the district court to exclude even relevant evidence that would create unfair prejudice, confuse the issues, or mislead the jury. Here, the district court correctly determined that the introduction of Mr. Williams' prior sex offense conviction would have little probative value, but would very likely mislead the jury and create a risk of unfair prejudice. And that's especially the case because that conviction carries no obvious value as impeachment evidence in these circumstances. It is not an offense involving a dishonest act or false statement. It does not place Mr. Williams in proximity to Mr. Duggar's computer on any relevant date, and it does not suggest his technical capacity to have installed the partition or remotely accessed the computer. The court's limitation was also consistent with the Supreme Court's decision in Holmes v. South Carolina. Now, I believe my friend on the other side suggested that Holmes set down the principle that defendants have an absolute constitutional right to introduce alternative perpetrator evidence. In fact, Holmes expressly approved the principle that alternative perpetrator evidence, quote, may be excluded where it does not sufficiently connect the other person to the crime as, for example, where the evidence is speculative or remote, end quote. Counsel, I'll tell you exactly what concerns me. The district court made an error of law in one respect. The district court said the critical inquiry concerns the strength of the prosecution's case. And when I was reading the materials on this case, my eyes just about, you know, bugged out of my head because I'm like, that is clearly wrong. It's not the case that a stronger prosecution case means you can exclude alternative perpetrator evidence. So what I'm trying to figure out is did that infect the rest of the district court's analysis on alternative perpetrator? Absolutely, Your Honor. So a couple of points on that. We acknowledged in our brief, as did the district court below, that during one of the times that this was addressed at trial, the district court inadvertently read the wrong passage from Holmes into the record. I would point out that the district court stated the correct principle the day before when it said, quote, there has to be some demonstrable nexus of proof that links the alternative perpetrator to the crime, end quote. The district court or, I'm sorry, the Supreme Court in Holmes also never said that you cannot consider the strength of the prosecution's evidence. It just says that you can't solely consider the strength of the prosecution's case. Obviously, the strength of the prosecution's case is in some respects relevant to the probative versus prejudicial balancing test that Rule 403 instructs district courts to engage in. But just to kind of allay your concerns about the one instance where the district court read the wrong passage of Holmes, the court also contemporaneously, right in the same section of transcript, contemporaneously quoted decisions applying the correct principle. And this is at the trial transcript, volume 6, page 1362, where the district court describes as the, quote, money quote, the Tenth Circuit's holding that a nonspeculative nexus between the crime charged and the alleged perpetrator is a threshold requirement for alternative perpetrator evidence. And finally, the district court explained post-trial that its misstatement was inadvertent and did not reflect a misunderstanding of the applicable principle. That's at Record Document 156, pages 19 through 20. I don't believe Mr. Duggar has ever expressly contended that the district court was misrepresenting its recollection or its understanding of the law. We certainly see no basis in the record for making that kind of conclusion. Unless the court has further questions on alternative perpetrator evidence, I'll turn to suppression. So the district court correctly declined to suppress Mr. Duggar's voluntary statements to Agents Faulkner and Aycock because Mr. Duggar was not in custody at any point during the search of his used car lot. For over 30 years, this Court has considered the same six Griffin factors to decide whether an interview was custodial. On pages 24 through 30 of our brief, we went through all of those factors and explained why each supports the district court's finding that Mr. Duggar was not in custody. I want to focus on just two that I think are particularly salient to the analysis in this case. So number one, Mr. Duggar was repeatedly told that he was not in custody and was free to leave. Of course, the incantation of that or statement of that incantation, you're free to go, is not by itself always sufficient if there are other circumstances that indicate a person really isn't free. That's true, Your Honor. I agree that those are not magic words that, you know, could otherwise excuse extremely egregious custodial circumstances or something like that. I would note, however, that in the Zecre case, which we cite in our brief, you said that, quote, no governing precedent of the Supreme Court or this Court holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning. So if they aren't magic words, they're about as close as we can come under the prevailing precedent. But here, I think it's important that the agents didn't just kind of say this as a general prophylactic and leave it at that. Mr. Duggar was advised meaningfully on at least three separate occasions that he was not under arrest and was free to leave. First, when the agents approached him and informed him that they were there to execute a search warrant rather than an arrest warrant and he was free to leave, he even engaged in a little bit of back and forth with them, explained to the agents that his wife was pregnant and was expecting soon and, you know, that he may have to leave in order to contact her, and the agents said that's perfectly fine. Second, when Mr. Duggar was presented with the statement of rights forms at the outset of his conversation with the agents, and the agents, in fact, manually edited that form at Mr. Duggar's request to remove the phrase into custody, which is kind of the standard language that they put on that form. Mr. Duggar was somewhat bothered by the phrase into custody, and so they said, all right, we'll edit that. We'll cross that out. And finally, when Mr. Duggar indicated to the agents that he would, quote, leave here sooner rather than later, and they again reiterated that it was his decision whether and when to leave the scene. And that brings us to the second of the Griffin factors that I think is especially relevant to this case, which is that Mr. Duggar did leave the scene of his own volition at a time of his choosing and without being arrested. This Court has considered circumstances that are candidly much closer to the custodial line, but found no custodial interrogation where the interaction terminated without an arrest. So in the Mullenbrook case that we cited at page 30 of our brief, the suspect was transported in a police car from his home to the station and questioned in a small windowless interrogation room behind closed doors. And this Court determined that that was not a custodial interrogation because at the end of the interrogation, the police drove him back home and he was not arrested. Here, Mr. Duggar voluntarily ended the interview. He left his employee, Randall Berry, in charge of the lot for the rest of the search, and he departed under his own power. He was, in fact, not arrested until almost a year and a half later. So I think those two factors, you know, as we pointed out in our brief, we think that all six of the Griffin factors favor the government here and clearly foreclose any contention that Mr. Duggar was in custody, but certainly the fact that he was repeatedly advised that he was not in custody, repeatedly advised that he was free to leave at any time, and that he then availed himself of that liberty and left the lot at a time of his choosing without needing the officers to drive him, without even needing them to move their cars, without needing any assistance from the officers. I think that that clearly forecloses any contention that this was a custodial interrogation. You know, I am a little concerned, though. I mean, I get the point on custody. I asked opposing counsel about it, but I'm a little concerned when you know apparently the agent knew that he was trying to call his counsel, and it appears that might have been the only way he could have done so. And so it does concern me when somebody makes an attempt to contact counsel, come and swoop away the phone, even if it's pursuant to the warrant, and then is unable then to call counsel because there's no alternative way to do it. I mean, that does create – I mean, I understand that this was a weird situation, but I've never seen that before. Sure. So, Judge Shost, I think a couple of points on that. First, it's not clear from the record whether there was another way to contact counsel. Mr. Duggar was on the scene with two companions, one employee and one possibly friend. They, I believe, at least one of them, it's in the record that he had a cell phone that was not seized by officers as part of the evidence that they collected and transported from the scene. I think that the record just reflects that his cell phone was, they call it like a manual inspection by the officers. So, first of all, as a threshold matter, it's not abundantly clear that there was no other phone available that he could use. But even if we assume that that's the case, Mr. Duggar's method of contacting his lawyer, which, again, he ultimately availed himself of, was leaving the scene. And once again, the officers told him repeatedly he was free to leave the scene. When they first started their conversation with him, they said, you don't have to talk to us. You don't have to talk to us without a lawyer present. You can, you know, we can do this later once you've had a chance to talk to a lawyer. I mean, I think all of that shows that he was, he had an option to speak to a lawyer even though, obviously, the officers had appropriately seized his phone at the outside of their search. I did just want to, you know, on that topic, there are a couple of relevant precedents. I mean, I think in the Mullenbrook case, again, that I discussed a moment ago and that we cited on page 30 of our brief, this Court declined to address the defendant's argument that he had made an unambiguous request for counsel during the interview. And you declined to even address that because you determined on the basis of the Griffin factors that he was not in custody during that interrogation. So it's not entirely clear whether there was support for that unambiguous invocation there. But again, the question of unambiguous invocation is a secondary matter after we get past the threshold custodial burden. And, you know, there's also Zecre where officers directed a suspect not to answer an incoming call. And this Court upheld the denial of suppression there after finding that it was not custodial. Also, cell phones were not even widely available when this Court decided Griffin. So certainly, the availability of a cell phone in someone's pocket or their hand cannot be, you know, kind of a threshold criterion for the attachment of Miranda. I know that Mr. Gelfand did not have a chance to address this. I'm happy to answer any questions about the metadata issue or the expert testimony. I did just, you know, very briefly want to say that while I'd be happy to discuss why the district court appropriately exercised its discretion when delimiting this testimony, really the photographic metadata issue is much ado about nothing here because text messages from Mr. Duggar's iPhone, the accuracy of which has never been challenged. He has never challenged the accuracy of the text messages either in the district court or in his appellate briefing. Those messages independently placed Mr. Duggar at the scene of the crime on dates of offense conduct without reference to any photographic metadata. And just to very briefly go through a couple examples, on May 14th, when the law enforcement program Torrential Downpour detects that Mr. Duggar's IP address was on May 15th, at 11.15 p.m., at 5.49 p.m., Mr. Duggar's iPhone sent a text message reading, quote, at my car lot, end quote. On May 15th, at 11.15 a.m., Mr. Duggar's iPhone sends a text message reading, quote, I'm at my car lot now, end quote. Twenty minutes later, at 11.35 a.m., child sexual abuse material is downloaded on the partition section of Mr. Duggar's computer. And later that day, at 5.08 p.m., Mr. Duggar's iPhone sends a text message reading, quote, I'm here at the car lot, will be here until around 6 or so, end quote. Fourteen minutes later, at 5.22 p.m., child sexual abuse material is downloaded on the partition. So even if you were to set aside all of the photographic metadata in its entirety, uncontroverted evidence, specifically Mr. Duggar's own words in his text messages, places him at the car lot in close temporal proximity to the criminal conduct here. Unless the Court has further questions, I'll rest on our brief and respectfully request that you affirm the judgment below. Thank you. Thank you, Mr. Handel. Mr. Gilfen, your rebuttal. Thank you, Your Honor. May it please the Court. In response to the Court's question, opposing counsel said, quote, there's no evidence that Mr. Williams was present at the car lot on May 13th, end quote. In fact, the government never presented any evidence, credible or otherwise, that Mr. Williams was anywhere or wasn't anywhere on the dates at issue, and the government had every opportunity to do so. The government responded to the questions about the Court's limitations by suggesting that the Court essentially imposed very limited limitations. That really is belied by the record itself. What the government, I'm sorry, what the Court expressly said after applying a test that the Supreme Court said was unconstitutional in the first place, is that if he says he wasn't there, you can't talk about what happened. That's a direct quote from the transcript. But Judge Strass' question really strikes at the heart of this issue, and I think it's critical that everyone understands this. What the judge did, and I mean no disrespect to Judge Brooks, but what the trial court did is the day before in that in-chambers, on-the-record conference that we cite abundantly, is he stated the wrong principle and expressly said that he was, in fact, going to consider the strength of the government's case. Then the very next day, when we're at sidebar and this comes up, the Court expressly cites the portion of the Holmes case that does that. There was no ambiguity. The Court said, I'm going to look at the strength of the government's case in evaluating this, and then the Court, in the very moment, does look at the strength of the government's case. He actually expressly says so. And the reason why that's so important is that that's an error of law, and it's an error of law of a constitutional magnitude, because what it did is it effectively imposed such concrete limitations on what Mr. Duggar could do. So the Court's correction of the misstatement you don't think was effective? Your Honor, the Court's correction of the misstatement, so to speak, happened in an order denying our motion for a new trial raising this issue, and the Court in no way spoke to what happened in chambers the day before. And that shed significant light on the rationale or the test that the Court was applying. So, no, I don't believe that that solves the issue. The reason that we have contemporaneous transcripts is because, especially in this instance where the Court is articulating, here's the test I'm applying, here's the standard I'm applying, that would be an impeccable record if the test was a constitutional test, if the test was a correct test as a matter of law in understanding what the Court was doing. And to the Court's credit, the Court was articulating what the Court was doing. The fatal problem with that for purposes of anything other than reversing and granting a new trial is that's the very analysis, the strength of the government's case, that the U.S. Supreme Court in Holmes determined was unconstitutional. The fourth real quick just point of clarification is that the colleague's cell phone that was briefly mentioned with respect to the person, individual with Mr. Duggar, was being, and I don't remember the exact phrase used, but essentially manually triaged, searched by law enforcement. To say the least, that does not make it available for Mr. Duggar to contact his lawyer. There was nothing stopping the agent from saying, I am seizing your phone, but use my phone or use a law enforcement phone to contact your attorney. The agent didn't want Mr. Duggar to have the opportunity to speak with counsel, even though he physically tried to do so. Now, finally, it is well-settled law that an expert can critique the methodology used by other experts. And it appears that oral argument that what the government is essentially saying is, this is a whole lot about nothing, essentially what the government is saying is this is harmless error and the Court should look to these text messages. That's not sufficient based on the fact that this was a general verdict that was delivered by the jury. In other words, we don't know which particular date or time the jury used to determine whether Mr. Duggar was proven guilty beyond a reasonable doubt as to the count of conviction. And so the reason this EXIF metadata is so critical is that this was what we call in our brief the house of cards on which the government's case was built. In other words, placing Duggar, attempting to place Mr. Duggar at or near the car lot at specific dates and times. But that house of cards was delivered by Mr. Fotrell in a way that should have been subject to critique by Ms. Bush. For all of these reasons, we ask that this Court reverse this case and grant a new trial, a fair trial, a constitutional trial. Thank you. Thank you, Mr. Gelfand. Thank you also, Mr. Handel. The Court appreciates both counsel's participation and argument before the Court this morning. We will take the case under advisement.